**E-FILED**
Thursday, 04 August, 2005  12:28:34 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY SALLENGER, as the | ) | |
| Administrator of the Estate of | ) | |
| ANDREW B. SALLENGER, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  03-3093 |
| | ) | |
| CITY OF SPRINGFIELD, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendants' Motion For Summary Judgment (d/e 86) (Defendants' Motion).[1]  Defendants seek judgment on all claims set forth in Plaintiff Mary Sallenger's Second

---

[1]The Defendants in this case are the City of Springfield (City), and several individuals who were members of the Springfield Police Department (Department) throughout the period relevant to Plaintiff's claims, including: John W. Harris, Chief of Police, Officer Brian Oakes, Sergeant James Zimmerman, and Officer Jason Oliver, who are sued in their individual capacities (collectively, the Individual Defendants).  The Department, as well as the Individual Defendants in their official capacities, were dismissed with prejudice by this Court's October 8, 2003, Order (d/e 9).  In addition, on January 28, 2005, Plaintiff Mary Sallenger voluntarily dismissed Defendant Officer James Wangard with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1).  <u>See</u> <u>Stipulation For Dismissal (d/e 85)</u>.

Amended Complaint (d/e 83), which alleges violations of Andrew Sallenger's (Andrew) rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983. The Second Amended Complaint also asserts causes of action under various provisions of Illinois state law and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. For the reasons set forth below, Defendants' Motion for Summary Judgment is allowed in part and denied in part.

<u>STATEMENT OF FACTS</u>

Early in the morning of April 30, 2002, 35 year-old, divorced Caucasian male Andrew Sallenger experienced a severe psychotic episode caused by mental illness. At the time of the episode, Andrew's mother Mary Sallenger (who is the Plaintiff in this action), his sister Kim Nolan, Ms. Nolan's four children, and Andrew, were spending the night at Mary Sallenger's Springfield, Illinois, residence. When Andrew woke the household with his yells and disturbing behavior, the children, Ms. Nolan, and Ms. Sallenger left the residence together to call 911.

Ms. Nolan made the 911 call. She reported to the operator that Andrew was "completely naked and he keeps on yelling at us, keeps saying

that he's sorry and he's got the cat locked in the bedroom.  He's in there breaking all kinds of stuff."  <u>Plaintiff's Response to Defendants' Motion for Summary Judgment (d/e 92)</u> (Plaintiff's Response), Exh. 1, <u>Deposition of Sergeant Zimmerman</u> (Zimmerman Dep.), Deposition Exh. 1, <u>911 Call Transcript</u>, pg. 1.  She requested that the 911 operator dispatch paramedics to the residence "[t]o take him.  I mean he's very, you know, he's very psychotic.  I mean he's running around naked in front of the kids and everything."  <u>Id.</u> at 2.  She notified the dispatcher that her brother was "schizophrenic bipolar manic depressive . . .", and that she had gone "to the state's attorney today to try to have [Andrew] involuntarily committed cause he wouldn't go on his own and they said that they couldn't do nothing cause they didn't have enough evidence . . . ."  <u>Id.</u> at 1-3.  She also reported that Andrew ". . . was after us.  We had to run out the door."  <u>Id.</u> at 3.  Ms. Nolan made the 911 call at 1:49 a.m.  <u>Defendants' Motion</u>, <u>Defendants' Undisputed Fact</u> (DUF) ¶ 2.

Three Department officers were immediately dispatched to the scene: Sergeant James Zimmerman, Officer Brian Oakes, and Officer Jason Oliver. All three officers arrived at the Sallenger home by 2:07 a.m.  <u>Id.</u>, <u>DUF</u> ¶¶ 5 & 7.  By this time, Ms. Nolan, Ms. Sallenger, and the children had returned

and were waiting outside the residence for a response to Ms. Nolan's 911 call.

Upon their arrival, Ms. Nolan notified the officers that Andrew was mentally ill.  <u>Id.</u>, <u>DUF</u> ¶ 14.  Both Ms. Nolan and the Plaintiff asked the officers when the paramedics would arrive to help Andrew, and the Plaintiff told the officers that she wanted the paramedics to help Andrew, not the officers.  <u>Plaintiff's Response</u>, <u>Additional Material Facts</u> (AMF) ¶¶ 163-64. Nolan also informed the officers that the back door to the Sallenger residence was unlocked, and that they could enter the residence from that point.  <u>Defendants' Motion</u>, <u>DUF</u> ¶ 17.  Further, she told Officer Oakes that Andrew was going crazy, throwing things around the house, chasing the cat, and chasing the members of the household while naked.  <u>Id.</u>, <u>DUF</u> ¶¶ 15 & 16.

Officer Oakes informed Sergeant Zimmerman that Andrew had a mental problem and that he was big and strong.  <u>Defendants' Motion</u>, Exh. 3, <u>Zimmerman Dep.</u>, pgs. 54, 75.  Officer Oliver testified that Oakes and Zimmerman mentioned to him that Andrew had recently had a conflict with Department officers on April 28, 2002.  <u>Id.</u>, Exh. 2, <u>Oliver Dep.</u>, pgs. 34-35. He also testified that he was informed "that one of the family members told

Oakes and Zimmerman that [Andrew] would probably fight with [them]."
Id.

At the time of the events underlying this suit, Andrew weighed 262 pounds and stood approximately 6' tall.  Id., Exh. 5, Andrew Sallenger Autopsy Report, pg. 5.  The officers were also large men: Sergeant Zimmerman stood 5' 10" tall and weighed 260 pounds; Officer Oakes stood 5' 10" tall and weighed 220 pounds; and Officer Oliver stood 6' 3" tall and weighed 215 pounds.  Id., Exh. 3, Zimmerman Dep., pg. 102; Exh. 1, Oakes Dep., pg. 50-51; Exh. 2, Oliver Dep., pg. 12.  Further, both Officers Oakes and Oliver were weight-lifters, each capable of bench-pressing approximately 275 pounds.  Id.

At the time of the encounter, Department policy was to treat all individuals equally, regardless of mental illness.  Id., Exh. 9, Deposition of Chief of Police John Harris (Harris Dep.), pg. 55.  The only support services available to Department officers for dealing with the mentally disturbed was to have an ambulance transport the individual to a hospital for observation and treatment.  Id., Exh. 3, Zimmerman Dep., pg. 79; Plaintiff's Response, AMF ¶ 86.  None of the officers had training specifically designed to help them respond to a mentally disturbed individual.  Id., Exh. 1, Oakes Dep.,

pgs. 12, 37; Exh. 2, <u>Oliver Dep.</u>, pg. 9; Exh. 3, <u>Zimmerman Dep.</u>, pgs. 39,

42, 57.  Lieutenant William Pittman, who was the Assistant Chief of Police

responsible for the Field Operations Division at the time of the incident,

testified that Department police officers encountered mentally ill individuals

once per week on average, and possibly as frequently as once per day.

<u>Plaintiff's Response</u>, Exh. 21, <u>Deposition of Lieutenant William Pittman</u>

(Pittman Dep.), pgs. 62-63.  The April 30, 2002, Department policy of

officers treating the mentally ill as they would any other individual differed

from the policy adopted by the International Association of Chiefs of Police

(IACP), which issued Model Policies for dealing with the mentally ill in

April 1997.  <u>Id.</u>, <u>AMF</u> ¶ 157.  That Model Policy stated that:

> . . . unless a crime of violence has been committed and/or a
> dangerous weapon is involved, officers should normally respond
> to the incident or approach a known mentally ill subject in a low
> profile manner . . . officers should request backup and any
> specialized crisis intervention assistance available while taking
> initial steps necessary to moderate or diffuse a situation.

<u>Id.</u>, <u>AMF</u> ¶ 158.

 As the ranking officer, Sergeant Zimmerman led the other officers

into the Sallenger residence.  Both he and Officer Oliver testified that they

believed at that point, based on the information they had received, that they

would arrest Andrew for disorderly conduct, 720 ILCS § 5/26-1(a)(1), which is a Class C misdemeanor.  <u>Defendants' Motion</u>, <u>DUF</u> ¶¶ 22 & 23.  Officer Oakes, however, testified that he did not intend to arrest Andrew when he entered the home; he wanted to get Andrew's side of the story.  <u>Id.</u>, Exh. 1, <u>Oakes Dep.</u>, pgs. 34-35.  The officers entered the home with Sergeant Zimmerman in the lead, Officer Oakes following, and Officer Oliver in the rear.

Sergeant Zimmerman announced the officers' entrance into the Sallenger home by calling out to Andrew and telling him they were members of the Department.  <u>Id.</u>, Exh. 3, <u>Zimmerman Dep.</u>, pg. 41.  Sergeant Zimmerman was unsure when he entered the residence whether Andrew was still present because Andrew could have exited the building while his family was making the 911 call.  <u>Id.</u> at 71-72.  The residence was dark, and the officers used their flashlights for illumination.  <u>Id.</u> at 73.  When the officers first saw Andrew, he was sitting cross-legged on the floor of his bedroom, completely naked, with his back against the side of his bed, and his right side facing the officers.  <u>Id.</u>  The officers could hear Andrew muttering something about colors and fishing.  <u>Id.</u> at 52-53, 77-78; Exh. 1, <u>Oakes Dep.</u>, pg. 110.  Sergeant Zimmerman recalled that there were no lights on

in Andrew's bedroom, but Officers Oakes and Oliver remember that a small bedroom lamp was on.  Compare id., Exh. 3, Zimmerman Dep., pg. 73, with Exh. 1, Oakes Dep., pg. 106-07; Exh. 2, Oliver Dep., pg. 42.

At first it appeared that Andrew was not aware of the officers' presence, despite Sergeant Zimmerman's verbal announcements.   The officers advanced toward Andrew's bedroom.  Andrew first acknowledged the officers by saying, "Hey, what are you guys doing here."  Id., DUF ¶ 50. The officers claim that Andrew next threw a small, white ashtray-shaped item that came to rest near Sergeant Zimmerman.  Id., Exh. 1, Oakes Dep., pg. 124; Exh. 2, Oliver Dep., pg. 52; Exh. 3, Zimmerman Dep., pg. 88. Plaintiff disputes this claim, however, based on the fact that crime scene investigator Sergeant Paul Schuh found no such item when he investigated the bedroom after the encounter.  Plaintiff's Response, Exh. 10, Schuh Dep., pg. 40.

Andrew then stood up and approached the officers, who had paused at the threshold of the bedroom, approximately five to six feet away from where Andrew was sitting.  Defendants' Motion, Exh. 3, Zimmerman Dep., pg. 90.  Sergeant Zimmerman, who was closest to Andrew, testified that after Andrew stood up he swore at the officers, rushed at Zimmerman,

grabbed his shoulder radio equipment, and knocked his flashlight out of his right hand. Id. at 93-94. Officer Oakes, who was just behind Zimmerman, testified that Andrew swore at the officers, threatened to kill them, clenched his fists, and quickly came at the officers with his fists up. Id., Exh. 1, Oakes Dep., pg. 124, 127-28. Officer Oliver, who was farthest away from Andrew and standing behind both Zimmerman and Oakes, testified that Andrew swore at the officers, clenched his fists and approached in a "boxing position," stopped in front of Zimmerman, and then started to reach for Zimmerman with both hands. Id., Exh. 2, Oliver Dep., pgs. 51, 59-62.

Next, Officer Oakes discharged oleoresin capsicum (OC) spray into Andrew's face, simultaneously with Sergeant Zimmerman's contact with Andrew.[2] Some of the OC spray also hit Sergeant Zimmerman in the face. Sergeant Zimmerman pushed Andrew backward and both fell into the bedroom, with Sergeant Zimmerman on top of Andrew. Id., DUF ¶ 69. Andrew managed to turn himself over onto his stomach as Officer Oliver

---

[2]OC spray is also known as pepper spray. Officer Oakes testified that OC spray is used to subdue an arrestee by inflaming the eyes and nose with the painful irritant. Id., Exh. 1, Oakes Dep., pgs. 129-131. The Fourth Circuit described the effects of OC spray as follows: "(1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." Park v. Shiflett, 250 F.3d 843, 849 (4th Cir. 2001).

grabbed Andrew's right arm; Officer Oakes moved to control Andrew's legs, and Sergeant Zimmerman grabbed Andrew's left arm.  The officers struggled with Andrew to get Andrew's arms behind his back, but Andrew tucked his arms under his torso to prevent handcuffing.  The officers began repeatedly telling Andrew that he was under arrest and commanding him to stop resisting arrest.  Id., DUF ¶ 86.  During the struggle, Andrew repeatedly told the officers to leave his house and threatened to kill them.  Id., DUF ¶ 89.

Despite the officers' efforts to keep him prone, Andrew brought himself up onto his hands and knees.  Officer Oliver put his knee across Andrew's shoulder blades to push him back down, but Andrew was able to lunge to the bed, lifting his torso onto the bed, with his knees on the floor.  The officers found it difficult to hold Andrew because he was naked, sweating, and covered in the oil-based OC spray.  Id., DUF ¶ 112.  All three officers followed Andrew to the bed, where Andrew tucked his arms under his torso again.  Id., DUF ¶ 116.

At some point in the struggle, the bedroom lamp was knocked over, plunging the room into darkness.  Officer Oakes threw his flashlight onto the bed to illuminate the room.  Ms. Nolan witnessed the bedroom light go out from her position outside the home, and then witnessed what she

described as a flashlight beam ". . . moving around [inside the bedroom]. Like a hitting motion . . . ." <u>Id.</u>, Exh. 8, <u>Deposition of Kimberly Nolan</u> (Nolan Dep.), pg. 82.

Soon after Andrew lunged to the bed, however, both Officer Oliver and Sergeant Zimmerman were successful in getting Andrew's right and left arms behind his back, and he was handcuffed.  Officers Oakes and Oliver reported that Officer Oakes handcuffed Andrew, using Officer Oakes' handcuffs, while Officer Oliver and Sergeant Zimmerman held Andrew's hands behind his back.  <u>Id.</u>, Exh. 1, <u>Oakes Dep.</u>, pg. 151; Exh. 2, <u>Oliver Dep.</u>, pg. 111.  Sergeant Zimmerman recalled that Officers Oakes and Oliver were able to put a handcuff on Andrew's right arm before he was able to control Andrew's left arm enough for it to be handcuffed.  <u>Id.</u>, Exh. 3, <u>Zimmerman Dep.</u>, pg. 101.  Sergeant Zimmerman reported that it was not until Andrew had reached the bed that the officers "finally were able to get the arms out from underneath [Andrew] and get them . . . handcuffed." <u>Id.</u> at 105-06.

Before Andrew was handcuffed, the officers applied several progressively severe means of force to get him to comply with their orders. First, Officer Oliver used several pressure point techniques, which were

11

ineffective, and Sergeant Zimmerman used an armbar technique in an attempt to bring Andrew's left arm behind his back.  Second, both Officer Oliver and Officer Oakes administered closed-fist strikes to Andrew, with Officer Oliver striking Andrew's right shoulder two or three times, and Officer Oakes striking the right common peroneal area, a nerve area behind the right thigh, with two sets of three punches each.  Id., DUF ¶ 150; Exh. 1, Oakes Dep., pgs. 145, 147; Exh. 2, Oliver Dep., pgs. 106-07.  Third, Officer Oakes struck Andrew with three sets of flashlight strikes, three per set, in Andrew's right common peroneal area.  Id., DUF ¶ 127.

Andrew continued to struggle despite the handcuffs, trying to pull his hands apart and telling the officers to remove the handcuffs or he would kill them.  Id., DUF ¶¶ 147, 165.  In the course of this struggle, Andrew kicked Officer Oakes several times.  Id., DUF ¶ 143.  Officer Oakes was trying to control Andrew's legs while Officer Oliver held Andrew's shoulders down. Id., DUF ¶ 177.  Both Officers Oakes and Oliver used additional force, beyond open-hand control, on Andrew to prevent him from struggling after the handcuffing.  Officer Oakes struck Andrew three more times with his flashlight in the right common peroneal area.  Id., DUF ¶ 149.  Officer Oliver delivered two closed-fist punches to Sallenger's shoulder area, and

two flashlight strikes to Andrew's right upper arm, because he thought Andrew was reaching for his duty belt.  Id., DUF ¶¶ 168-69.

After Andrew was handcuffed, Sergeant Zimmerman left the bedroom to wash out the OC spray that had inadvertently hit him in the eyes when Officer Oakes sprayed Andrew earlier in the encounter.  Id., DUF ¶ 172. After attempting to wash out his eyes, Sergeant Zimmerman returned to the bedroom to see if Officers Oakes and Oliver were okay.  They responded affirmatively.  Id., DUF ¶ 174.  Then Sergeant Zimmerman left again to continue to flush the OC spray from his eyes.  Id., DUF ¶ 176.  When Sergeant Zimmerman returned a second time, Officer Oakes gave him his car keys and asked Sergeant Zimmerman to bring Oakes the hobble he kept in his police car.  Id., DUF ¶ 181.

At the time of the incident, Department policy allowed, and even directed, officers to use hobbles in some circumstances.  Department Special Order #88-20 stated that a hobble ". . . device will be utilized on combative prisoners . . .", and "the device shall be used in cases in which a prisoner is displaying or has indicated signs of a hostile and combative nature." Plaintiff's Response, Exh. 9, Expert Report of Michael D. Lyman, Ph.D. (Lyman Report), pg. 11 (quoting Department Special Order #88-20).  No

officer training was offered by the Department in the use of a hobble.  Id.,
AMF ¶ 55.  Officer Oakes' hobble was not issued by the Department, but
was privately purchased from a retail website.  Defendants' Motion, Exh. 1,
Oakes Dep., pgs. 77-76.  None of the officers had been trained in the use of
a hobble, although Officer Oakes testified that he had read the instructions
that came with the hobble, and had seen other Department officers use a
hobble.  Defendants' Motion, Exh. 1, Oakes Dep., pgs. 78-79, 98; Exh. 2,
Oliver Dep., pg. 148; Exh. 3, Zimmerman Dep., pgs. 122-23.  Sergeant
Zimmerman knew, however, that it was important to turn a person
restrained in a hobbled position on his side "to make sure that the airway
is clear and that [the arrestee] can still breathe."  Id., Exh. 3, Zimmerman
Dep., pg. 137.  Officer Oakes was not aware until after the incident in
question that a hobble could create a risk of positional asphyxiation.  Id.,
Exh. 1, Oakes Dep., pgs. 169, 172.

When Sergeant Zimmerman returned with Oakes' hobble, Andrew's
torso was still on the bed, with his knees on the floor and his body in a
kneeling position.  Defendants' Motion, DUF ¶ 186.  Officer Oliver was
partially on the bed, with his right knee on Andrew's right shoulder area, his
right hand pressing on Andrew's left shoulder, and his left hand pulling up

on the handcuff chain to keep Andrew from slipping the handcuffs or jerking at them.  Plaintiff's Response, Exh. 2, Oliver Dep., pgs. 117-120. Officer Oakes was still trying to control Andrew's feet.  Defendants' Motion, DUF ¶ 183.  Sergeant Zimmerman and Officer Oakes then placed the hobble on Andrew.  Id., DUF ¶ 189.

Officer Oakes described the hobble as a cord that looped around both of Andrew's legs in the area between his ankles and calves, connected to a strap that was then attached to the handcuffs.  Plaintiff's Response, Exh. 3, Oakes Dep., pgs. 76-82.  Officer Oakes testified that he pulled the strap connecting the leg restraint to the handcuffs taunt enough that, although Andrew's knees were on the floor, "his feet were no longer--the toes of the feet were no longer touching the ground; they were elevated, more or less . . . [and] [h]is lower legs from below his knees were . . . pointing towards his butt . . . ."  Id. at 87-88.  After the hobble was applied, on Sergeant Zimmerman's command, all three officers released Andrew and stepped back.  Defendants' Motion, DUF ¶ 195.  Sergeant Zimmerman and Officer Oliver stated that Andrew kept struggling after the hobble was applied.  Id., Exh. 3, Zimmerman Dep., pg. 133; Exh. 2, Oliver Dep., pg. 130-31.  It is unclear from the record how closely the hobble drew Andrew's feet and

hands together.  Plaintiff's Response, Exh. 3, Oakes Dep., pg. 89.

The officers differ in their accounts of Andrew's position after he was hobbled.  Sergeant Zimmerman testified that he rolled Andrew off the bed and onto his side after Officer Oakes applied the hobble.  Id., Exh. 3, Zimmerman Dep., pgs. 172-73.  Yet Officer Oakes testified that Andrew was hobbled with his torso leaning up against the bed, and that "[h]e remained in that position" after he was hobbled.  Id., Exh. 3, Oakes Dep., pgs. 87-91.  He stated that Andrew was not taken off the bed until after Sergeant Zimmerman recognized that Andrew was no longer breathing.  Id. at 94-95.  Further, Officer Oliver's testimony agrees with Officer Oakes.  Officer Oliver stated that it was not until after Sergeant Zimmerman asked if Andrew was still breathing that the officers "[r]olled [Andrew] off of the bed, [and] took the hobble and the handcuffs off of him."  Id., Exh. 2, Oliver Dep., pg. 132.  Lieutenant Mark Bridges, of the Department, testified that when he arrived (shortly before the officers realized Andrew was no longer breathing), Andrew was hobbled and leaning against the bed.  Plaintiff's Response, Exh. 19, Deposition of Lieutenant Mark Bridges (Bridges Dep.), pgs. 41-44, 51.

Additionally, Sergeant Zimmerman, Officer Oakes, and Officer Oliver

16

recount that the time between the hobbling and their realization that Andrew was no longer breathing was only a few seconds. <u>Defendants'</u> <u>Motion</u>, Exh. 1, <u>Oakes Dep.</u>, pg. 66; Exh. 2, <u>Oliver Dep.</u>, pg. 131; Exh. 3, <u>Zimmerman Dep.</u>, pgs. 138-39. Lieutenant Bridges stated that upon arrival he saw that Andrew was hobbled and no longer a threat, and quickly checked in with the officers present. <u>Plaintiff's Response</u>, Exh. 19, <u>Bridges</u> <u>Dep.</u>, pgs. 49-50. To him it appeared that Sergeant Zimmerman and Officer Oakes were perspiring heavily and were out of breath. <u>Id.</u>, Dep. Exh. 1, pg. 1. It was at that time, according to Lieutenant Bridges, that Officer Oakes indicated that he did not think Andrew was breathing. <u>Id.</u> at 50. Sergeant Zimmerman then checked and found that Andrew was no longer breathing, and Lieutenant Bridges called for paramedics. <u>Id.</u> at 51. Ambulance personnel from Springfield Area Ambulance were dispatched to the Sallenger residence at 2:23 a.m. <u>Defendants' Motion</u>, <u>DUF</u> ¶ 224.

Ms. Nolan stated, however, that she witnessed Sergeant Zimmerman retrieve the hobble from a police car, return with it to the Sallenger home, and then come out some time later to wipe off his face. <u>Defendants'</u> <u>Motion</u>, Exh. 8, <u>Nolan Dep.</u>, pg. 105-06. Ms. Nolan testified that she heard Andrew scream three times, and then she followed Sergeant Zimmerman

back into the home and to Andrew's bedroom.  Id. at 99, 105-06.  At the door to Andrew's bedroom, Ms. Nolan said she reached into the bedroom, turned on the overhead light, and saw Andrew handcuffed and hobbled, with his head and chest on the bed and his knees on the ground.  Id. at 103.  Responding to Andrew's appearance, Ms. Nolan stated that she started screaming, ". . . oh, my God, you killed my brother, you killed my brother."  Id. at 106.  She said the officers did not check for a pulse until after she came into Andrew's bedroom and started screaming.  Id.  Officer Oliver stated that he remembered Ms. Nolan coming into the bedroom after Andrew was handcuffed, but before he was hobbled.  Defendants' Motion, Exh. 2, Oliver Dep., pg. 132-33.

After Sergeant Zimmerman determined that Andrew was not breathing and had no pulse, the officers removed the hobble and Andrew's right hand was uncuffed.  Id., DUF ¶ 210.  Officer Oakes recalls that Sergeant Daley and Officer Kean entered the bedroom at this time, and that an officer began cardio-pulmonary resuscitation (CPR).[3]  Id., Exh. 1, Oakes

---

[3]There is some dispute over who started CPR.  Officer Oakes remembers that Officer Kean began CPR; Lieutenant Bridges testified that it was Sergeant Daley; and Sergeant Zimmerman stated that he started CPR.  Compare id., Exh. 3, Zimmerman Dep., pgs. 136, 139, with Plaintiff's Response, Exh. 19, Bridges Dep., pgs. 51-52, and with Exh. 1, Oakes Dep., pg. 95.

<u>Dep.</u>, pg. 95.  All lifesaving efforts were ultimately fruitless.  Andrew was transported to St. John's Hospital in Springfield, Illinois.  He never regained consciousness, and was declared brain dead on May 1, 2002.  <u>Defendants'</u> <u>Motion</u>, Exh. 5, <u>Andrew Sallenger Autopsy Report</u>, pg. 1.

Dr. Kent Harshbarger, M.D., J.D., a Sangamon County medical examiner, performed the autopsy on Andrew.  He concluded that the cause of death was "a cardiorespiratory arrest during prone police restraint due to excited or agitated delirium.  The death [was] contributed to by clinical history of mental illness, cardiomegaly, fatty liver, and obesity."  <u>Id.</u>, Exh. 5, <u>Andrew Sallenger Autopsy Report</u>, pg. 3.  In the course of reaching his conclusion about the cause of death, Dr. Harshbarger noted that he had considered "Information . . . provided by personal conversations with Susan Boone, the Sangamon County Coroner, hospital chart, Emergency Room Record and Sgt[.] Eric Hall of the Illinois State Police."  <u>Id.</u>, <u>Andrew Sallenger Autopsy Report</u>, pg. 5.

Dr. Harshbarger explained that the phenomenon of excited or agitated delirium is "characterized by agitation, hostility, bizarre or hyperactive behavior, paranoia, shouting, thrashing, ranting and usually performing feats of exceptional strength or endurance without apparent fatigue."  <u>Id.</u>  In

Andrew's case, Dr. Harshbarger opined that his death was "likely related to the various neurophysiologic or neurochemical stressors acting upon underlying natural disease processes as opposed to any clinically relevant reduction in blood oxygenation during the period of restraint." Id. Further, Dr. Harshbarger identified Andrew's cardiomegaly, or abnormally large heart, as a risk factor for sudden cardiac arrest. Id., Deposition of Dr. Harshbarger (Harshbarger Dep.), pg. 42. In contrast to a normal male heart of 350 grams, Andrew's heart weighed 550 grams. Id.

Dr. Harshbarger also acknowledged, however, that in cases like Andrew's where prone restraint techniques are employed:

> [m]any investigators focus on the potential for "positional asphyxia" or reduction in blood oxygenation as the underlying cause of death, however, the data to date does not confirm significant lowering of blood oxygen in healthy volunteer subjects. The test subjects do demonstrate a prolonged pulse recovery time when in the prone and "hobbled" position confirming a physiologic mechanism affecting the heart that is related only to body positioning.

Id., Andrew Sallenger Autopsy Report, pg. 3.

In his examination of Andrew's physical injuries, Dr. Harshbarger concluded that "there were no injuries identified internally or externally, at the time of autopsy, which would explain a sudden death." Id. In his

20

deposition, Dr. Harshbarger pointed out that ". . . the bruises [on Andrew's body] are significant. . . . many of the contusions are large and of great force.  Particularly in the arms, and the lateral sides of the arms, lateral sides of the thighs, exactly where they should be in someone trying to be restrained.  [But] [t]hey're not lethal."  Id., Harshbarger Dep., pg. 127.

On September 10, 2002, Chief of Police Harris prohibited Department officers from using hobbles to subdue arrestees.  Plaintiff's Response, Exh. 9, Lyman Report, pg. 11 n.24.  At some point thereafter, Officer Oakes destroyed both the hobble he had used on Andrew during the events at issue here and the instructions that came with the hobble, and threw them both away.  Id., AMF ¶ 115; Id., Exh. 3, pg. 174.  Defendants seek summary judgment on the Second Amended Complaint which contains the following claims:

COUNT I –        42 U.S.C. § 1983, under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution;

COUNT II –       Assault and Battery;

COUNT III –      Unlawful Use of Excessive Force;

COUNT IV –       Unlawful Use of Deadly Force;

COUNT V –        Unlawful Arrest;

COUNT VII –        Intentional Infliction of Emotional Distress;

COUNT IX –         Failure to Provide Medical and Psychological
                   Treatment;

COUNT XI –         Wrongful Death;

COUNT XII –        Americans With Disabilities Act, pursuant to
                   42 U.S.C. § 12101 et seq.;

COUNT XIII –       Spoliation of Evidence.

See Second Amended Complaint.[4]  Counts I and XII are brought against the

---

[4]There is some uncertainty in the record concerning Counts VI, VIII, and X of the Second Amended Complaint.  Those counts were also pleaded in the original Complaint. On October 8, 2003, the Court dismissed those counts in the original Complaint for reasons stated in its written Order (d/e 9).  Thereafter, Plaintiff sought and obtained leave to file her Amended Complaint in order to add some claims.  The Amended Complaint was filed on August 12, 2004; it incorporated all of the claims which had been filed in the original Complaint, as well as two new ones.  Defendants moved to dismiss the Amended Complaint.  Plaintiff then filed on August 20, 2004, a Motion to Withdraw the Amended Complaint due to clerical errors in it, and asked for leave to file a "corrected" amended complaint (d/e 57).  In that Motion Plaintiff stated that she "has no intention of reviving claims, allegations or name parties of which have already been disposed of in Defendants' initial Motion to Dismiss.  Plaintiff merely wishes to add two additional counts to the already existing original Complaint." (¶ 7, d/e 57).  The Motion was allowed and the corrected Amended Complaint was filed on August 24, 2004; it again was labeled Amended Complaint and contained all of the original counts and two new ones.  On September 7, 2004, Defendants answered it; in the Answer Defendants simply noted that Counts VI, VIII, and X had been stricken.

Thereafter, on December 14, 2004, Plaintiff moved for leave to file a corrected amended complaint claiming she had inadvertently omitted page 17 from the Amended Complaint which had been filed on August 24, 2004 (d/e 81).  The Court allowed the Motion and directed that this complaint be filed as the "Second Amended Complaint," since the file already contained two "Amended Complaints."  No separate answer has been filed to the Second Amended Complaint.

Therefore, since both sides appear to accept that Counts VI, VIII, and X have previously been stricken and should remain stricken, the Court adopts the reasons stated in its October 8, 2003, ruling and again strikes them from the Second Amended Complaint.  The Court further deems the Answer filed by Defendants on September 7,

Individual Defendants and the City of Springfield.  Counts II-XI and XIII are brought against the Individual Defendants and against the City of Springfield under a theory of <u>respondeat</u> <u>superior</u>.  For the reasons set forth below, Defendants' Motion is allowed in part, and denied in part.

<u>STANDARD OF REVIEW</u>

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

<u>ANALYSIS</u>

I.    <u>ADMISSIBILITY OF PLAINTIFF'S EXPERT TESTIMONY</u>

---

2004, to the Amended Complaint to be their Answer to the Second Amended Complaint.

As an initial matter, Defendants challenge the admissibility and sufficiency of the expert testimony Plaintiff relied upon in responding to Defendants' Motion, based on the Federal Rules of Evidence (Fed. R. Evid.) and the Federal Rules of Civil Procedure (Fed. R. Civ. P.).  First, Defendants challenge the testimony of Plaintiff's experts Dr. Michael Lyman, Dr. John Taraska, and Dr. Jane Velez, by arguing that their opinions are neither admissible under the Fed. R. Evid. and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, nor supported by sufficient evidence to create a genuine issue of material fact to defeat Defendants' Motion for Summary Judgment, pursuant to <u>Zenith Electronics Corp. v. WH-TV Broadcasting Corp.  See Daubert</u>, 509 U.S. 579 (1993); <u>Zenith</u>, 395 F.3d 416 (7th Cir. 2005).  Second, Defendants challenge the admissibility of Dr. Kent E. Harshbarger's testimony, by contending that Plaintiff did not disclose Dr. Harshbarger as a Fed. R. Civ. P. 26(a)(2)(A) expert.

A.    <u>Admissibility of Plaintiff's Expert Opinion Under Fed. R. Evid.</u>

Under Fed. R. Evid. 104(a), the Court is vested with the responsibility of determining the admissibility of expert testimony by a preponderance of

proof.[5]  Fed. R. Evid. 104(a); Daubert, 509 U.S. at 592 n.10.  In this task,

the Court is guided by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To determine whether an expert's opinions are based on "scientific,

technical, or other specialized knowledge," the Supreme Court has set forth

a non-exhaustive list of factors to consider, which has been summarized as

follows:

> (1) whether the theory is scientific knowledge that will assist the trier of fact and can be tested; (2) whether the theory has been subjected to peer review or publication; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) the extent to which the

---

[5]Federal Rule of Evidence 104 states:
(a) Questions of admissibility generally.  Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).  In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact.  When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

methodology or technique employed by the expert is generally accepted in the scientific community.

Clark v. Takata Corp., 192 F.3d 750, 757 n.3 (7th Cir. 1999), citing Daubert, 509 U.S. at 593-94; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-150 (1999) (holding that Rule 702 applies to "technical, or other specialized knowledge" as well, and that the Daubert factors can be considered for those types of knowledge).

This test, however, is a flexible one. Bryant v. City of Chicago, 200 F.3d 1092, 1098 (7th Cir. 2000). The Daubert Court noted, "The inquiry envisioned . . . is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594-95 (footnote omitted). Further, the Court noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. at 596. In Kumho Tire Co., Ltd., the Court also explained that "[t]he trial court must have the same kind of latitude in deciding how to test an

expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable." Kumho Tire Co., Ltd., 526 U.S. at 152 (emphasis in the original).

Even if the means used to reach an expert conclusion are proper, however, an expert's testimony may be inadmissible under Fed. R. Evid. 702 if the expert fails to properly support his opinion.  The Seventh Circuit has noted:

> A witness who invokes "my expertise" rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term.  [The expert] may be the world's leading student of MMDS services, but if he could or would not explain how his conclusions met the Rule's requirements, he was not entitled to give expert testimony.  As we so often reiterate: "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."

Zenith Electronics Corp., 395 F.3d at 419, quoting Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d 1333, 1339 (7th Cir. 1989).

Defendants contend that the reports and opinions of Plaintiff's experts, Dr. Michael Lyman, Dr. John Taraska, and Dr. Jane Velez, do not pass muster under Fed. R. Evid. 702.  The Court now turns to the Defendants' arguments.

### 1.   Dr. Michael Lyman

Defendants argue that Dr. Lyman's expert report, which relies in part on the International Association of Chiefs of Police (IACP) model policies and standard of care statement, lacks a proper foundation because Dr. Lyman never explained why the model policies of the IACP are a recognized authority in the field.  Defendants' Reply, pg. 32; see Plaintiff's Response, Exh. 9, Expert Report of Michael D. Lyman, Ph.D., pgs. 6-9.  However, Defendants accepted as undisputed the following Additional Material Fact offered by the Plaintiff: "The model rules proffered by the International Association of Chiefs of Police are properly relied on by Chiefs of Police, experts, and consultants in the law enforcement industry."  Plaintiff's Response, AMF ¶ 18; Defendants' Reply, pg. 4.  Defendants are correct that Dr. Lyman's expert report lacks a proper foundation with regard to showing that the model policies are accepted as a recognized authority in police work; however, that fault was remedied when the Defendants accepted AMF ¶ 18.

### 2.   Dr. John J. Taraska

Defendants object to Dr. Taraska's opinion as stated in his deposition and Rule 26 report, and as used to support Plaintiff's Additional Material

Facts ¶¶ 98 and 156, because they are "completely devoid of any reference to medical or scientific literature to support his opinions."  <u>Defendants' Reply</u>, pg. 33.  Further, they contend that Dr. Taraska improperly relied in his Rule 26 report on Officer Oakes' testimony that a hobble could cause positional asphyxia, despite the fact that Officer Oakes is not a doctor.  <u>See Plaintiff's Response</u>, Exh. 14, <u>Expert Report of John J. Taraska, M.D.</u> (Taraska Report), pg. 1 (Dr. Taraska noting that, "Officer Oakes indicated that a hobble restraint, when used in this manner, is known to cause positional asphyxia.").  Defendants insist that Dr. Taraska's opinion offered "no medically accepted and substantiated basis for the determination that a hobble may cause positional asphyxia", and, therefore, that it cannot be admitted.  <u>Id.</u>

The Court must determine whether Dr. Taraska has sufficient specialized knowledge to assist the factfinder in determining issues of relevance to this case.  To make this determination, the Court reads Dr. Taraska's deposition and Rule 26 expert report together.  Dr. Taraska's curriculum vitae indicates that he is board certified in anatomic and clinical pathology.

Dr. Taraska's Rule 26 report lists Andrew's cause of death as "sudden

cardiac arrest", caused by several factors, including: "a) positional asphyxia which resulted in hypoxia, b) the violent beating incurred at the hands of the three police officers, and c) secretion of norepinephrine stimulated by the stress of his beating and restraint by the police officers." Plaintiff's Response, Exh. 14, Expert Report of John J. Taraska, M.D. (Taraska Report), pgs. 1-2.  He states in his report that he relied upon Andrew's hospital records of April 30, 2002, Dr. Kent E. Harshbarger's Autopsy Report, photos from the autopsy, photos taken by Andrew's family before and after the incident, the Coroner's inquest, depositions, Andrew's death certificate, and police reports of the incident in reaching his opinions.  Id. Defendants are correct that Dr. Taraska does not explain in his report how these factors, which he claimed caused cardiac arrest, combined to cause Andrew's sudden cardiac arrest.  For example, Dr. Taraska does not explain the significance of the secretion of norepinephrine in causing cardiac arrest, or state an independent basis (besides Officer Oakes' statement) for his opinion that a hobble restraint can cause positional asphyxia.  Defendants are also correct that Dr. Taraska's report references no medical or scientific literature to support his conclusions.

Dr. Taraska's deposition, however, provides some additional basis for

his opinion.  In it, Dr. Taraska describes how the officers' actions stopped Andrew's heart by depriving it of oxygen after he had become agitated by the struggle.  Dr. Taraska opined that Andrew's heart stopped because it was beating quickly after the struggle, and needed more oxygen but could not get it because Andrew was pinned against the bed and his diaphragm could not expand.  Id. at 15.  Dr. Taraska testified:

> Q.  . . . was [Andrew's death] a culmination of the entire struggle that wound up putting him in a position where he wasn't able to breathe and his heart stopped[?]
>
> A.  Yeah, that's because they're on top of him after he's been hobbled.  And the hobbling itself can cause positional asphyxiation.  And he's hobbled, handcuffed, and then they are on top of him, and his heart, like I said, is beating faster and faster because of all the agitation, beating it needs more oxygen and [Andrew is] not getting it because he can't breathe.
>
> His diaphragm can't move because his abdomen is on the bed being pinned down.  His chest can't move because Officer Oliver has got his knee in [Andrew's] back and his two hands pressing down on his shoulder blades.
>
> Q.  And is it your understanding that he was still struggling at that point or that he completely stopped struggling?
>
> A.  They said he got calmer.  I think he was already dead when they stopped struggling.

* * *

31

Q.  So it was your belief then that he was actually dead before
   they released and got off of him?

A.  Yes.

Id., Deposition of Dr. John J. Taraska, pgs. 15-16.

Dr. Taraska's deposition testimony appears based on the officers'
incident reports and depositions with respect to the positions of the parties
and the pressure exerted by the officers on Andrew's shoulders, back, and
diaphragm.   His opinion that Andrew became unable to breathe and
suffered cardiac arrest appears based on the fact that the officers were on
top of him and his diaphragm couldn't move, as well as positional asphyxia
resulting from use of the hobble and secretion of norepinephrine.  Id.  Dr.
Taraska's deposition excerpt, however, also does not explain the significance
of the secretion of norepinephrine in causing cardiac arrest, or state an
independent basis (besides Officer Oakes' statement) for his opinion that
a hobble restraint can cause positional asphyxia.  Therefore, the Court finds
that Dr. Taraska's opinions that refer to the hobble's role in causing
Andrew's positional asphyxia and to the secretion of norepinephrine, will
not be considered in ruling on the pending Motion because they are not
adequately explained under Fed. R. Evid. 702 in Dr. Taraska's Rule 26

Report and Deposition.  Zenith Electronics Corp., 395 F.3d at 419, quoting

Mid-State Fertilizer Co., 877 F.2d at 1339.  The Court will consider his

opinion on the role that the force used by the officers, and the position of

the parties, played in causing Andrew's death.

### 3.   Dr. Jane Velez

Defendants also dispute Plaintiff's Additional Material Facts

supported by the testimony of Dr. Jane Velez, Psy.D., A.B.P.S.   See

Plaintiff's Response, pgs. 44-45, 51, ¶¶ 101-107, 153, 155.  Defendants

argue that,"Dr. Velez testified in her deposition that she has no experience

or qualifications in regard to police procedures, therefore the statements in

Plaintiff's Additional Material Facts attributed to her which deal with such

matters have no evidentiary basis and should be stricken."  Defendants'

Reply, pg. 33.

By her own admission, Dr. Velez has no expertise in police procedure.

Defendants' Exhibit 16 (d/e 97), Deposition of Dr. Jane Velez (Velez Dep.),

pgs. 49-50.  Further, she has no knowledge of the mental health resources

available to Springfield Police officers in April, 2002.   Id. at 48.

Accordingly, her testimony as to the standard in police procedure for dealing

with the mentally ill is unsubstantiated.  In light of that fact, her testimony

is irrelevant in this case and is barred.

      B.      <u>Federal Rule of Civil Procedure 26(a)(2)(A) Disclosure</u>

Defendants move the Court to strike Plaintiff's use of Dr. Kent Harshbarger, M.D., J.D.'s testimony because Plaintiff did not disclose Dr. Harshbarger as an expert witness by way of a Fed. R. Civ. P. 26 report.  In <u>Musser v. Gentiva Health Services</u>, the Seventh Circuit confirmed that under Fed. R. Civ. P. 26, even treating physicians must be disclosed as experts.  <u>Musser</u>, 356 F.3d 751, 758 (7th Cir. 2004).  Further, under Fed. R. Civ. P. 37(c)(1), "exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless."  <u>Id.</u> at 758.

Defendants are correct that Plaintiff should have disclosed Dr. Harshbarger as an expert.  <u>Id.</u> at 757, n.2.  This error, however, was a harmless one that does not justify striking Dr. Harshbarger's testimony under Fed. R. Civ. P. 37.  Dr. Harshbarger is a public official who served as a Sangamon County medical examiner at the time of Andrew's death.  Dr. Harshbarger performed the autopsy of Andrew, and filed a public report documenting the results of that autopsy, on which Defendants rely.  <u>See Defendants' Motion</u>, Exh. 5, <u>May 29, 2002, Report of Coroner's Physician to the Coroner of Sangamon County, Illinois</u> (Coroner's Report).

Accordingly, Defendants were already on notice that Dr. Harshbarger was an expert based on his Coroner's Report, and they have treated him as such. Plaintiff's failure to disclose Dr. Harshbarger as a Rule 26 expert was a harmless error. Therefore, Defendants' motion to strike Plaintiff's use of Dr. Harshbarger's testimony is denied.

II.    42 U.S.C. § 1983 CLAIM AGAINST INDIVIDUAL DEFENDANTS

Plaintiff brings suit against the Individual Defendants in Count I pursuant to 42 U.S.C. § 1983, for violations of Andrew's rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Second Amended Complaint, ¶ 65. The Individual Defendants move for summary judgment on Plaintiff's constitutional claims.

Plaintiff does not contest the Individual Defendants' Motion with respect to her claims under the First, Sixth, and Eighth Amendments. Therefore, those claims are dismissed. For the following reasons, the Individual Defendants' Motion with respect to Plaintiff's Fourth Amendment excessive force claim is denied; the Motion is allowed with respect to Plaintiff's Fourth Amendment failure to provide medical care claim, and the Motion is allowed with respect to the Fourteenth

Amendment claims.

A.    Fourth Amendment Excessive Use of Force In Effecting Arrest

Plaintiff contends that Sergeant Zimmerman, Officer Oakes, and Officer Oliver entered into the Sallenger home and proceeded to illegally arrest Andrew with the use of "excessive and deadly force".[6]  Second Amended Complaint, ¶ 42.  In opposition to the Individual Defendants' Motion, Plaintiff states that the officers "willfully and wantonly ignored the family's pleas for medical attention and rushed [into] the house, cornered Andrew in his bedroom, struck him over forty times, eventually causing his death from positional asphyxiation."[7]  Plaintiff's Response to Defendants' Motion For Summary Judgment (Plaintiff's Response), pg. 54.

Plaintiff's claim concerns Andrew's Fourth Amendment right "to be

---

[6]The Court notes that Plaintiff's Response contends that "[t]here was no crime committed by Andrew Sallenger prior to the police officers unlawfully entering his home."  Plaintiff's Response, pg. 57 (emphasis added).  Plaintiff's Second Amended Complaint, however, does not allege that the officers unlawfully entered the Sallenger home on the morning of April 30, 2002.  See Second Amended Complaint, ¶¶ 38-39.  Plaintiff's Response cannot be used to amend Plaintiff's Second Amended Complaint.  Fed. R. Civ. P. 15(a).  Further, it is undisputed that Kimberly Nolan advised the officers that they could proceed inside.  Defendants' Motion, Exh. 8, Deposition of Kimberly Nolan (Nolan Dep.), pgs. 73-74.

[7]It is undisputed that John W. Harris, Chief of Police, was not present during the incident with Andrew.  Further, no evidence has been produced that Harris directed the actions of the other officers in this case.  Accordingly, Count I is dismissed against John W. Harris.

secure in [his] person[] . . . against unreasonable . . . seizures . . . ."  U.S.
Const. amend. IV.  Plaintiff's claim is properly analyzed under the Fourth
Amendment's "objective reasonableness" standard, made applicable to the
states through the Fourteenth Amendment.  Graham v. Connor, 490 U.S.
386, 388, 395 (1989).  The reasonableness of a "particular seizure depends
not only on when it is made, but also on how it is carried out."  Id. at 395
(emphasis in the original).

   To determine if the force used to effect a seizure is reasonable, "'the
nature and quality of the intrusion on the individual's Fourth Amendment
interests' [must be balanced] against the countervailing governmental
interests at stake."  Id. at 396, quoting Tennessee v. Garner, 471 U.S. 1, 8
(1985).  Although this balancing test is "not capable of precise definition or
mechanical application," close attention should be paid to "the severity of
the crime at issue, whether the suspect poses an immediate threat to the
safety of the officers or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight."  Id. (internal citations omitted).  "Due
to the fact-specific nature of the inquiry, the determination whether a police
officer utilized excessive force depends on the totality of the circumstances
surrounding the encounter."  Estate of Phillips v. City of Milwaukee, 123

F.3d 586, 592 (7th Cir. 1997).

The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.  Further, the balancing test must allow "for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 397.  To evaluate the "objective reasonableness" of the use of force, the officers' state of mind is not relevant.[8]  Instead:

> . . . the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. (internal citations omitted).

In the continuum of force used to effect an arrest, it is unreasonable

---

[8]The Supreme Court qualified this point by noting that an officer's state of mind may be relevant ". . . in assessing the credibility of an officer's account of the circumstances that prompted the use of force . . . ." Id. at 399 n.12, citing Scott v. United States, 436 U.S. 128, 139, n. 13 (1978).  Further, an officer's ". . . objective 'good faith'--that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment--may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983." Id., citing Anderson v. Creighton, 483 U.S. 635 (1987).

for an officer to use deadly force – defined as a use of force "with . . . a substantial risk of causing death or serious bodily harm", <u>Estate of Phillips</u>, 123 F.3d at 593 – unless "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm. . . ." <u>Garner</u>, 471 U.S. at 11.  In <u>Estate of Phillips</u>, however, the Seventh Circuit held that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." <u>Id.</u> at 593.

Plaintiff urges the Court to evaluate the reasonableness of the officers' actions at several different moments in time during their encounter with Andrew (ranging from their initial entrance into the Sallenger home, to their ultimate subduing of Andrew by applying handcuffs and a hobble).  <u>See Plaintiff's Response</u>, pgs. 58-59.  The Court's analysis, however, focuses primarily on the force used by the officers to arrest Andrew.  It is undisputed that the officers used no force until they encountered Andrew in his bedroom in the Sallenger home.  Accordingly, the Court's analysis begins there.

After announcing themselves, entering, and advancing through the Sallenger home, the officers saw Andrew sitting naked and cross-legged in

his bedroom, with his right side facing toward the officers.  Defendants'
Motion, Exh. 1, Oakes Dep., pg. 110; Exh. 3, Zimmerman Dep., pgs. 52-53,
77-78.  The officers claim that Andrew threw a small, white object the size
of an ashtray toward Sergeant Zimmerman, thereby escalating the situation
from an investigation of possible disorderly conduct to assault.  See
Defendants' Motion, Exh. 1, Oakes Dep., pg. 124; Exh. 2, Oliver Dep., pg.
52; Exh. 3, Zimmerman Dep., pg. 88.  Plaintiff disputes this fact, because
no such object was found at the scene by crime scene investigator Sergeant
Paul D. Schuh, and Schuh reported that no officer mentioned the object to
him at any time during his investigation.  Plaintiff's Response, Exh. 10,
Schuh Dep., pg. 40.  Viewing the evidence in the light most favorable to
Plaintiff, the Court must assume at this stage that Andrew did not throw an
object at the officers.

The officers also testified that Andrew stood up and approached them,
although they differed slightly in their accounts of the sequence of events
that triggered the use of force against Andrew.  Sergeant Zimmerman, who
was closest to Andrew, testified that after Andrew stood up, he swore at the
officers, rushed at Zimmerman, grabbed his shoulder radio equipment, and
knocked his flashlight out of his right hand.  Defendants' Motion, Exh. 3,

Zimmerman Dep., pgs. 93-94.   Officer Oakes, who was just behind Zimmerman, testified that Andrew swore at the officers, clenched his fists, and quickly came at the officers with his fists up.  Id., Exh. 1, Oakes Dep., pg. 127-28.  Officer Oliver, who was farthest away from Andrew and behind Zimmerman and Oakes, testified that Andrew swore at the officers, clenched his fists and approached in a "boxing position," stopped in front of Zimmerman, and then started to reach for Zimmerman with both hands. Id., Exh. 2, Oliver Dep., pgs. 51, 59-62.

Plaintiff argues that these accounts differ sufficiently to create a genuine issue of material fact as to whether Andrew attacked the officers. Viewing this evidence in the light most favorable to the Plaintiff, however, there is still sufficient consistency between the officers' accounts to demonstrate that Andrew approached the officers and put them in apprehension that he was about to batter Sergeant Zimmerman.  See 720 ILCS § 5/12-2(a)(6).  Further, Plaintiff can offer no evidence, beyond minor inconsistencies in the officers' accounts, to raise a question of fact here.  The undisputed evidence is that Andrew initiated the aggressive behavior toward the officers.  Questions exist, however, with respect to the officers' response to Andrew's initial aggression.

41

Next, Officer Oakes fired a burst of OC spray into Andrew's face, and all three officers laid hands on Andrew to take him into custody.  Andrew forcibly resisted the officers' attempts to arrest him, despite the officers' orders to stop resisting.  In the course of the encounter, it is undisputed that the officers used their physical strength and mass, various pressure point and hold techniques, closed-fist strikes, flashlight strikes, handcuffs, and a hobble device, to subdue Andrew.  First, there is medical evidence that Andrew suffered either a possible flashlight or closed-fist strike to the head.  See Plaintiff's Response, Exh. 11, Harshbarger Dep., pg. 68 (testifying that one of Andrew's head injuries was linear and consistent with a flashlight or closed-fist blow).  If Andrew's head injury was caused by a deliberate blow to the head, that blow may have been an unreasonable use of force under Garner.  Garner, 471 U.S. at 11.  The officers deny ever striking Andrew in the head intentionally; however, viewing the evidence in the light most favorable to Plaintiff, the Court finds that a question of fact remains with respect to the reasonableness of the amount of force used.

Second, once Andrew was handcuffed, Officers Oliver and Oakes continued to use maximum force flashlight and closed-fist strikes to subdue him.  Officer Oliver stated he delivered two closed-fist strikes to Andrew's

42

right shoulder, and two flashlight strikes to Andrew's right shoulder blade area after Andrew was handcuffed.  Defendants' Motion, Exh. 2, Oliver Dep., pgs. 134-37, 142.  Officer Oakes testified that he struck Andrew with his flashlight three times with maximum force in the rear of Andrew's right thigh after Andrew was handcuffed.  Id., Exh. 1, Oakes Dep., pgs. 155-56.  Both officers testified that they felt the blows were necessary to control Andrew.  Id.

During this time, however, Sergeant Zimmerman left the bedroom on at least two occasions, to clear his eyes of OC spray, and on another occasion to secure the hobble from Oakes' squad car.  Id., DUF ¶¶ 176, 182.  Thus a question of fact exists regarding the degree of control the officers had over Andrew when they administered these strikes since Sergeant Zimmerman felt safe leaving Officers Oakes and Oliver alone with Andrew on these three separate occasions.  Further, Plaintiff has presented evidence in the form of expert testimony that closed-fist and flashlight strikes on a handcuffed arrestee may be an unreasonable use of force.  See Plaintiff's Response, Exh. 15, Saunders Dep., pgs. 127-28 (Officer Oliver's strikes after handcuffing "probably should have been stopped").

Third, there is an issue of fact as to whether the hobbling itself was a

43

reasonable use of force. Officer Oakes testified that after he administered the fourth and last set of three flashlight strikes to Andrew's right common peroneal area, Andrew "stopped kicking, stopped trying to move." <u>Id.</u>, Exh. 3, <u>Oakes Dep.</u>, pg. 61. Officer Oakes subsequently contradicted this testimony when he stated that Andrew still did not quiet down after the last set of flashlight strikes. <u>Id.</u> at 71. Officer Oakes' testimony also conflicts with both Sergeant Zimmerman and Officer Oliver's recollection that Andrew was still struggling when the hobble was applied. <u>Id.</u>, Exh. 1, <u>Zimmerman Dep.</u>, pgs. 133, 135; Exh. 2, <u>Oliver Dep.</u>, pg. 130-31. Accordingly, there is still an issue of fact as to whether Andrew was still struggling when the hobble was applied and whether the use of the hobble was necessary.

Fourth, there is an issue of fact as to whether the officers properly positioned Andrew after hobbling him. Sergeant Zimmerman knew that it was important to roll a hobbled individual onto his side to keep the airway clear. <u>Id.</u>, <u>AMF</u> ¶ 151. Further, Sergeant Zimmerman testified that he rolled Andrew off the bed and onto his side after Officer Oakes applied the hobble. <u>Id.</u>, Exh. 1, <u>Zimmerman Dep.</u>, pg. 135. Yet Officer Oakes testified that Andrew was hobbled with his torso leaning up against the bed, and that

"[h]e remained in that position" after he was hobbled.  Id., Exh. 3, Oakes Dep., pgs. 87-91.  Officer Oakes stated that Andrew was not taken off the bed until after Sergeant Zimmerman recognized that he was no longer breathing.  Id. at 94-95.  Officer Oliver stated that it was not until after Sergeant Zimmerman asked if Andrew was still breathing that the officers "[r]olled [Andrew] off the bed, [and] took the hobble and the handcuffs off of him."  Id., Exh. 2, Oliver Dep., pg. 132.  Lieutenant Mark Bridges testified that when he arrived (shortly before the officers realized Andrew was no longer breathing), Andrew was hobbled and leaning against the bed. Id., Exh. 19, Deposition of Lieutenant Mark Bridges (Bridges Dep.), pgs. 41-44, 51.

Accordingly, on this claim there exist genuine issues of material fact with respect to the timing and amount of force used by the officers and the reasonableness of the force used.

B.     Fourth Amendment and a Failure to Provide Medical Care

Plaintiff also contends that Sergeant Zimmerman, Officer Oakes, and Officer Oliver failed to provide proper medical care to Andrew when they arrived on the scene and when Andrew began having difficulty breathing in that they failed to carefully monitor Andrew's breathing after applying the

45

hobble.  <u>Second Amended Complaint</u>, ¶ 40.  This claim is also analyzed under the Fourth Amendment "objective reasonableness" test.  Although in this context the officers' actions, or more properly – alleged inaction – is "not readily thought of as 'force,' the Fourth Amendment requires that seizures be <u>reasonable</u> under all the circumstances; and . . . it would be objectively unreasonable in certain circumstances to deny needed medical attention to an individual placed in custody who cannot help himself." <u>Estate of Phillips</u>, 123 F.3d at 596 (emphasis in the original).

When the officers arrived at the scene, they could have taken Andrew into custody to transport him to a mental health facility if, "as a result of [their] personal observation, the [officers had] reasonable grounds to believe that [Andrew was] subject to involuntary admission and in need of immediate hospitalization to protect [himself] or others from physical harm."  <u>See</u> 405 ILCS § 5/3-606.  To do so, however, the officers would have had to file a petition giving a detailed statement of the reasons for involuntary admission, as well as information about those interested in Andrew's welfare, such as his family.  405 ILCS § 5/3-601.  When the officers first entered the home, they observed Andrew sitting on the floor and heard him muttering about colors and fishing-- not causing physical

harm to anyone then.  Plaintiff concedes Andrew was not an immediate threat to the safety of anyone then.  <u>Plaintiff's Response</u>, p. 58.  However, as soon as the officers approached Andrew, the altercation between Andrew and the officers began.  Thus, the failure to obtain medical treatment for Andrew <u>before</u> the physical altercation began is not a basis of liability against the officers in this case.

The second prong of Plaintiff's claim is that the officers failed to obtain medical assistance for Andrew after the altercation with the officers, when he was in police custody.  Sergeant Zimmerman, Officer Oakes, and Officer Oliver recount that the time between the hobbling (when Andrew was effectively detained in the officers' judgment) and their realization that Andrew was no longer breathing was only a few seconds.  <u>Defendants'</u> <u>Motion</u>, Exh. 1, <u>Oakes Dep.</u>, pg. 66; Exh. 2, <u>Oliver Dep.</u>, pg. 131; Exh. 3, <u>Zimmerman Dep.</u>, pgs. 138-39.  Lieutenant Bridges stated that the officers realized Andrew was not breathing very shortly after his arrival in Andrew's bedroom.  <u>Plaintiff's Response</u>, Exh. 19, <u>Bridges Dep.</u>, pgs. 49-50.  Sergeant Zimmerman recalls Lieutenant Bridges being on the scene shortly after Andrew was hobbled.  <u>Defendants' Motion</u>, Exh. 3, <u>Zimmerman Dep.</u>, pgs. 135-36.

Ms. Nolan stated, however, that she witnessed Sergeant Zimmerman retrieve the hobble from a police car, return with it to the Sallenger home, and then come out some time later to wipe off his face.  Id., Exh. 8, Nolan Dep., pg. 105-06.  Ms. Nolan testified that she heard Andrew scream three times, and then she followed Sergeant Zimmerman back into the home into Andrew's bedroom.  Id. at 99, 105-06.  At the door to Andrew's bedroom, Ms. Nolan said she reached into the bedroom, turned on the overhead light, and saw Andrew handcuffed and hobbled, with his head and chest on the bed and his knees on the ground.  Id. at 103.  Responding to Andrew's appearance, Ms. Nolan stated that she started screaming, ". . . oh, my God, you killed my brother, you killed my brother."  Id. at 106.  She said the officers did not check for a pulse until after she came into Andrew's bedroom and started screaming.  Id.

Viewing the evidence in the light most favorable to the Plaintiff, and drawing all reasonable inferences therefrom, there is no issue of material fact supporting the contention that the officers failed to obtain medical assistance for Andrew in a timely manner once he was detained.[9]

---

[9]The Court views the failure to provide medical care portion of the Fourth Amendment claim as distinct from the excessive use of force claim.  However, the Court views the positioning of Andrew (or failure to position Andrew on his side) after the

After Ms. Nolan heard Andrew scream, she followed Sergeant Zimmerman into the bedroom, screamed at the officers, and then observed them check for Andrew's pulse.  (She could not realistically know if anyone had checked Andrew's pulse before she came into the room).  That sequence of events happened in quick succession.  Clearly Andrew was alive at the time Ms. Nolan heard him scream.  Dr. Taraska testified that he believed Andrew was already dead when they [the officers and Andrew] stopped struggling and that cardiac arrest manifests itself within minutes of its occurrence.  Plaintiff's Response, Exh. 14, Taraska Dep., pg. 16; Taraska Report, pg. 2.  Once it was determined that Andrew was not breathing, the officers placed him on his back on the floor, removed the hobble and the right handcuff, called for medical assistance, and began CPR.  Defendant's Motion, DUF ¶¶ 210, 211.  These efforts to summon aid for Andrew clearly came within the first few moments after Andrew quit breathing.  The Court, therefore, allows the Defendants' Motion for Summary Judgment with respect to the Fourth Amendment claim for failure to provide medical care.

---

hobbling as part of the excessive use of force claim, and the facts and circumstances surrounding the positioning of Andrew and the officers checking his condition remain viable under the excessive force claim.

C.   Fourteenth Amendment Due Process and Involuntary Commitment

Plaintiff also argues that Andrew was involuntarily committed to the State's custody when the officers chose to confront him in his home instead of calling for medical personnel.  Accordingly, Plaintiff contends that upon Andrew's "involuntarily commitment," the City acquired a duty under the Fourth and Fourteenth Amendments to provide medical treatment to Andrew, and to train its officers to provide the proper standard of care.  Plaintiff claims that the City failed in this duty and in support of her claim Plaintiff cites the Court to Youngberg v. Romeo.  Youngberg, 457 U.S. 307 (1982).

However, Youngberg is distinguishable from Plaintiff's claim on both the facts and on the constitutional principles at issue.  In Youngberg, the Court considered the Fourteenth Amendment substantive due process rights possessed by a severely mentally ill man named Romeo who was involuntarily committed through a legal process to a state mental institution.  The Court held that "[t]he mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment.  Indeed, the state

concedes that respondent has a right to adequate food, shelter, clothing, and medical care." Id. at 315 (internal citations omitted).  The Court also found that Romeo also retained "liberty interests in safety and freedom from bodily restraint."  Id. at 319.  Further, the Court held that, the state institution must work to habilitate or train Romeo to act in a way that will avoid violation of his liberty interests, to the extent such training is necessary to further his safety and prevent bodily restraint.  Id. at 322.

In the present case, the officers' interaction with Andrew cannot be analogized to a commitment proceeding before a court of law.  Further, Graham clearly states that this type of interaction must be analyzed as a seizure under the Fourth Amendment.  Graham, 490 U.S. at 395 ("all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." (emphasis in the original)).   Finally, Plaintiff misreads Youngberg to the extent that she attempts to have it stand for the proposition that the City must train its officers to any specific level.  Youngberg's reference to training focused on training given to Romeo, the

mentally disabled respondent, not to the state employees charged with his care.  Youngberg, 457 U.S. at 322.  Therefore, Defendants' Motion for Summary Judgment on this Fourteenth Amendment claim is allowed also.

D.    Qualified Immunity

The Individual Defendants contend that even if Plaintiff has presented evidence that they violated Andrew's constitutional right to be free of the use of excessive force, they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Wilson v. Layne, 526 U.S. 603, 609 (1999), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity "is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  Saucier v. Katz, 533 U.S. 194, 200-201 (2001), quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

A federal court considering a defense of qualified immunity must follow a two-step analysis. First, the court must rule on "this threshold

question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier</u>, 533 U.S. at 201.  If so, then the court must determine whether the right in question was clearly established at the time of the incident.   "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Id.</u> at 202, <u>quoting</u> <u>Anderson</u>, 483 U.S. at 640.

For a right to be clearly established, "it is not necessary that there be earlier cases with materially similar facts.  Rather, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'"  <u>Finsel v. Cruppenink</u>, 326 F.3d 903, 906 (7th Cir. 2003), <u>quoting</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).  An officer would not be entitled to qualified immunity if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand . . . ."  <u>Saucier</u>, 533 U.S. at 202.

As noted, <u>supra</u>, there exist genuine issues of material fact as to whether the force used by Sergeant Zimmerman, Officer Oakes, and Officer Oliver was excessive.  For the purpose of determining qualified immunity,

however, the Court views the evidence in the light most favorable to Plaintiff.  In that light, the evidence is that the officers delivered repeated, closed-fist blows and blows with flashlights to the back of Andrew's shoulders and thighs after Andrew was handcuffed, that the officers continued to strike Andrew and hobbled him after he had stopped trying to kick or move, and that the officers did not immediately put him on his side, to assist his breathing, after hobbling him.  The Court concludes when the evidence is viewed with these assumptions, that the officers' use of force was excessive.  Accordingly, the Court turns to the second question: whether the contours of the right in question were clearly established at the time of the incident.  Namely, did Officers Oakes and Oliver's use of closed-fist and flashlight strikes to Andrew's right arm, right shoulder, and right leg after he was handcuffed but before he was hobbled, and Officer Oakes and Sergeant Zimmerman's decision to apply the hobble itself and the method with which they applied it, violate Andrew's clearly established rights?

The right to be free of the use of excessive force was clearly established before the incident in question by both <u>Garner</u> and <u>Graham</u>.  <u>Garner</u>, 471 U.S. 1; <u>Graham</u>, 490 U.S. 386.  Although the Court notes that the situation between Andrew and the officers escalated into a physical confrontation

rapidly, the Court concludes that Officers Oakes and Oliver are not entitled to qualified immunity for the closed-fist and flashlight strikes they administered after Andrew was handcuffed.[10]  Sergeant Zimmerman and Officers Oakes and Oliver are also not entitled to qualified immunity for the act of hobbling Andrew without immediately placing him on his side.

When the officers arrived on the scene, they had probable cause to believe that Andrew had committed at most disorderly conduct, a Class C misdemeanor, punishable at most by 30 days in jail.  See 720 ILCS § 5/26-1; 730 ILCS § 5/5-8-3.  The officers received notice from Andrew's family upon their arrival that he was mentally ill.  Further, after Andrew was handcuffed, the threat to their safety diminished in relation to their increased control over Andrew.  The officers felt secure enough that Sergeant Zimmerman left the room several times to wash OC spray from his face.  Finally, if Andrew had quit moving and kicking before the hobble was applied, it is questionable whether a need to use it existed.  And at least one officer [Zimmerman] knew the importance of turning the hobbled person on his side.

---

[10]The Court recognizes that its ruling as to qualified immunity is appealable to the Seventh Circuit Court of Appeals before trial under the Federal Rules of Appellate Procedure.

Based on the totality of the circumstances surrounding the incident, and viewing the evidence in the light most favorable to the Plaintiff, the Court finds that the officers are not entitled to qualified immunity. Their application of force was objectively unreasonable when judged from the perspective of a reasonable officer on the scene in those circumstances, and that right was clearly established before the incident in question. Graham, 490 U.S. at 388, 395-96.

Therefore, the Individual Defendants' Motion for Summary Judgment on Count I of Plaintiff's Second Amended Complaint for violations of Andrew's constitutional rights under the Fourth and Fourteenth Amendment, is allowed in part, and denied in part. It is allowed in total with respect to Chief Harris (who was never at the scene and never directed the officers), and Count I against him in his individual capacity is dismissed. It is also allowed with respect to Plaintiff's claim for denial of medical assistance and involuntary commitment claims against all Individual Defendants. It is denied, however, with respect to Plaintiff's Fourth Amendment excessive use of force claims against Defendants Sergeant Zimmerman, Officer Oakes, and Officer Oliver.

III.   42 U.S.C. § 1983 CLAIM AGAINST CITY OF SPRINGFIELD

Defendant City moves for summary judgment on Plaintiff's claim against it under 42 U.S.C. § 1983.[11]   The City cannot be liable unless Plaintiff can show that Andrew's injuries were caused by a formal "policy" of the municipality or were part of a less formal "custom." <u>Monell v. Dep't of Soc. Serv. of City of New York</u>, 436 U.S. 658, 691 (1978).  The Supreme Court has noted that the plaintiff must show that "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." <u>Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 400 (1997).  A municipality's actions can constitute a "moving force" if a plaintiff can "show that the municipal action was taken with the requisite degree of culpability and. . . demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Id.</u> at 404.

The Seventh Circuit has summarized Supreme Court precedent on municipal liability under 42 U.S.C. § 1983 and concluded that for a municipality to be held liable:

---

[11]The Court notes that the City argues in its Reply to Plaintiff's Response to Motion for Summary Judgment (d/e 96) (Defendants' Reply), that Plaintiff's Second Amended Complaint fails to state a claim for failure to train under § 1983. <u>Defendants' Reply</u>, pg. 39.  It is improper for the City to raise a motion to dismiss in its Reply. <u>Fed. R. Civ. P.</u> 7.  The Court does not address the City's argument for that reason, and because it allows the City's Motion for Summary Judgment on Count I.

> There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury.

Lawrence v. Kenosha County, 391 F.3d 837, 844 (7th Cir. 2004).  In this case, Plaintiff relies on the first method of proving municipal liability. Plaintiff argues that two of the City's express policies caused Andrew's death: (1) the City's policy of treating all persons alike and correspondingly failing to train police officers in how to deal with the mentally ill, and (2) the City's policy of using hobbles on combative arrestees without training officers how to properly administer a hobble.

To establish municipal liability for an express policy and related failure to train, Plaintiff must present evidence showing that:

> . . . in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989) (emphasis added) (footnotes omitted).

A.    <u>City Policy of Treating All Citizens Alike</u>

The City contends that it had no express policy to deprive the mentally ill of their constitutionally-protected rights.  In support, it cites its policy of treating the mentally ill the same as other citizens.[12]  <u>Defendants' Motion</u>, <u>DUF</u> ¶ 29.  On the first prong, Plaintiff has failed to present evidence sufficient to create an issue of fact as to the adequacy of the City's training program for its officers.  The Seventh Circuit in <u>Palmquist v. Selvik</u> admonished that "the focus must be on the [City's training] program, not whether particular officers were adequately trained."  <u>Palmquist</u>, 111 F.3d 1332, 1345 (7th Cir. 1997).

Conspicuously absent from Plaintiff's case is evidence regarding the type of training Department officers did receive.  The record indicates that Sergeant Zimmerman, Officer Oakes, and Officer Oliver had no special training in dealing with the mentally ill.  However, the degree of training of particular officers is not at issue here.  Instead, Plaintiff must show that the Department's training program itself was deficient.  To do that, one must

_____

[12]The Court notes that Plaintiff only disputes DUF ¶ 29 to the extent that its policy was to treat those with mental disabilities "equally."  Plaintiff does not dispute that it was the City's policy to treat such individuals the same as other citizens.  <u>Plaintiff's Response</u>, pg. 8.

first demonstrate what the training program was.  It is possible that an existing training program that entails training officers in how to handle or approach other difficult or intoxicated subjects would have application to the mentally ill as well.  The absence of proof on what the training actually provided is critical.  See Celotex, 477 U.S. at 323 (summary judgment appropriate when non-moving party fails to present evidence on an element on which the party has the burden of proof at trial).

On the second prong, Plaintiff argues that the City was deliberately indifferent to the constitutional right at issue by ignoring the 1997 IACP Model Policy for dealing with the mentally ill, which Dr. Lyman opined is superior to the City's equal treatment policy.  There is evidence that Department officers encountered the mentally ill on a regular basis.  Yet the fact that better policies were available to the City does not prove a constitutional violation.  "The existence or possibility of other better policies which might have been used does not necessarily mean that the [City] was being deliberately indifferent."  Frake v. City of Chicago, 210 F.3d 779, 782 (7th Cir. 2000).  The City's policy of treating the mentally ill the same as every other citizen is not the type of policy that, on its face, presents an obvious potential for a constitutional violation.  Further, Plaintiff presents

no evidence to show that the Department's officers engaged in a pattern of constitutional violations involving the mentally disabled, which the City learned about but ignored.

Without more, the Court cannot conclude that an issue of fact exists tending to show that the need for more or different training was so obvious, and the inadequacy of the officers' training so likely to result in a violation of constitutional rights, that the City was deliberately indifferent to the needs of the mentally ill.   Therefore, the City's Motion for Summary Judgment on Plaintiff's claim for failure to train officers with regard to the mentally ill is allowed.   Likewise, the claim that the City engaged in a pattern and practice of discriminating against the mentally ill fails.

>   B.   <u>City Policy Regarding Use of Hobble Devices</u>

While the City admits that it had an express policy calling for the use of hobbles in certain situations, it asserts that Plaintiff ". . . can point to no incident whatsoever that would have put officers of the Springfield Police Department or the City of Springfield on notice that use of such devices was improper."  <u>Defendants' Reply</u>, pg. 38.  The City can only be liable under § 1983 for failing to train officers on how to use the hobble if Plaintiff can demonstrate that: (1) the training program at issue is inadequate for the

tasks the particular officers must perform; (2) the inadequacy arises from the city's deliberate indifference to the constitutional right at issue; and (3) the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. City of Canton, 489 U.S. at 389-91. The first prong is satisfied because the City admits both that it had no training program for the use of hobbles, and that "it is important for police officers to be trained in potential causes of positional asphyxiation. . . . [and that it] . . . is especially important where [the] department allows the use of hobbles and hog ties." Plaintiff's Response, AMF ¶¶ 19, 55.

A City can be guilty of deliberate indifference if it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation. The City's hobble policy called for the use of hobbles on "combative prisoners", a situation officers can be expected to face recurrently. Plaintiff's Response, Exh. 9, Lyman Report, pg. 11 (quoting Department Special Order #88-20). The parties agree that training in positional asphyxiation "is especially important where [the] department allows the use of hobbles and hog ties". Id., AMF ¶ 19. Thus, the obvious potential for a constitutional violation resulting from the use of a hobble is acknowledged.

On the third prong, however, Plaintiff has not presented evidence to show that the lack of training in the application of the hobble was closely related to or actually caused Andrew's death.  Even though the City had not trained the officers in the proper use of the hobble with respect to guarding against positional asphyxiation, at least one officer who was involved with hobbling Andrew was aware of it.  Sergeant Zimmerman stated that he knew it was important to roll a hobbled individual onto his side to enable breathing.  Since an officer knew this, any lack of training in this instance did not cause Andrew's injury.  The officers may have failed to do what they knew to do under such circumstances, but their failure was not due to a lack of training.  There is no nexus in this case between the failure to train and the injury to Andrew.   Therefore, the City's Motion with regard to Plaintiff's claim for failure to train officers in the use of a hobble must also be allowed, and Count I against the City is dismissed.

IV.   <u>STATE LAW CLAIMS AGAINST INDIVIDUAL DEFENDANTS</u>

A.   <u>Illinois Tort Immunity Act</u>

Defendants Sergeant Zimmerman, Officer Oakes, and Officer Oliver argue that they are immune from Plaintiff's state law claims under 745 ILCS § 10/2-201 because all of their actions involved determination of policy and

the exercise of discretion in performance of their duties as police officers. Section 10/2-201 states: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." Plaintiff responds by arguing that the officers' actions should be evaluated for immunity protection under 745 ILCS § 10/2-202, not § 10/2-201. Section 10/2-202 states: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."

Plaintiff is correct. The officers' testimony demonstrates that they entered the Sallenger household to enforce the law. Based on the representations of the Sallenger family, Sergeant Zimmerman and Officer Oliver both believed they would arrest Andrew for disorderly conduct. Officer Oakes wanted to gather more information before making a decision on whether to arrest Andrew, but his entry was designed to gather information to enforce the law. The officers' actions must be evaluated under § 10/2-202, not § 10/2-201. Accordingly, Defendants are not immune for any conduct found to be willful and wanton.

Willful and wanton conduct is defined by statute as ". . . a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others . . . ." 745 ILCS § 10/1-210.  The Seventh Circuit has noted that one engages in "willful and wanton conduct when he ignores known or plainly observable dangerous conditions and does something that will naturally and probably result in injury to another." Carter v. Chicago Police Officers, 165 F.3d 1071, 1081 (7th Cir. 1998).

As noted, supra, Plaintiff has created a genuine issue of material fact as to whether the officers used excessive force after handcuffing Andrew and by applying the hobble.  Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that there are issues of fact as to whether the officers' actions were willful and wanton.   Therefore, the Individual Defendants' Motion for Summary Judgment on Plaintiff's state law claims based on immunity from suit is denied.

B.   Illinois State Law Claims

1.   Counts II, III, and IV: Assault and Battery, Unlawful Use of Excessive Force, and Unlawful Use of Deadly Force

The Individual Defendants argue that their conduct was legally

justified based on Andrew's resistance and their own right to self-defense.
They may prevail at trial on these issues, but there are factual conflicts
which preclude summary judgment.  Based on the Court's findings above,
Plaintiff has created a genuine issue of material fact as to whether the
officers "intentionally or knowingly without legal justification and by any
means, (1) cause[d] bodily harm to an individual or (2) [made] physical
contact of an insulting or provoking nature with an individual."  720 ILCS
§ 5/12-3.

In addition, Plaintiff has created a genuine issue of material fact as to
whether the officers used force likely to cause death or great bodily harm
without justification.  A police officer making an arrest is only entitled to
use such force:

> when he reasonably believes that such force is necessary to
> prevent death or great bodily harm to himself or such other
> person, or when he reasonably believes both that: (1) Such force
> is necessary to prevent the arrest from being defeated by
> resistance or escape; and (2) The person to be arrested has
> committed or attempted a forcible felony which involves the
> infliction or threatened infliction of great bodily harm or is
> attempting to escape by use of a deadly weapon, or otherwise
> indicates that he will endanger human life or inflict great bodily
> harm unless arrested without delay.

720 ILCS § 5/7-5.  As discussed above, Plaintiff has presented evidence

showing that as the events unfolded, the officers achieved an increased degree of control over Andrew by handcuffing him.   Plaintiff has also presented evidence which raises questions as to whether the officers' continued use of force after handcuffing Andrew, their decision to hobble Andrew, and the manner in which they hobbled Andrew was reasonable, and whether they caused Andrew's death.   Therefore, the Individual Defendants' Motion for Summary Judgment on Plaintiff's state law claims of assault and battery and unlawful use of deadly force are denied.

The Court notes, however, that Plaintiff's claim in Count III for excessive use of force is duplicative of Count II.   Therefore, Count III is dismissed.

### 2.   Unlawful Arrest, Count V

Defendants are correct that Plaintiff has presented no evidence to create an issue of fact as to whether probable cause existed for the officers to arrest Andrew after he placed Sergeant Zimmerman in apprehension of being battered.   Even the initial call to 911 would support a finding of probable cause to arrest for disorderly conduct.   Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's unlawful arrest claim is allowed, and Count V is dismissed.

### 3.     Intentional Infliction of Emotional Distress, Count VII

Plaintiff alleges that the Individual Defendants intentionally inflicted emotional distress (IIED) upon Andrew as a result of their willful and wanton acts, thereby causing "physical injury, emotional trauma, medical expenses, severe mental anguish and wrongful death." Second Amended Complaint, ¶ 87.   Under Illinois law, a plaintiff must establish three elements to state a claim for IIED:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

McGrath v. Fahey, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (1988) (emphasis in the original).  The severity of the alleged emotional distress is measured by "'[t]he intensity and duration of the distress . . .'" Id., quoting Restatement (Second) of Torts § 46, comment j, at 77-78 (1965).

Based on the Court's holdings, supra, Plaintiff has created a genuine issue of material fact as to whether the officers' conduct was extreme and outrageous, which is the only basis on which the officers move for summary judgment.  Therefore, the Individual Defendants' Motion is denied.

4.   <u>Failure to Provide Medical and Psychological Treatment,</u>
<u>Count IX</u>

Plaintiff alleges that the Individual Defendants failed to provide
Andrew with medical and psychological treatment.   <u>Second Amended</u>
<u>Complaint</u>, ¶ 92.   Based on the reasons stated above in connection with
Count I, however, Plaintiff has not created a genuine issue of material fact
as to whether the officers failed to provide Andrew with medical treatment
in a prompt manner.   Further, the officers had no right to take him into
custody for psychological treatment before personally observing his
behavior, which the officers were in the process of performing when the
physical confrontation occurred.   405 ILCS § 5/3-606.   Therefore,
Defendants' Motion for Summary Judgment is allowed as to Plaintiff's claim
for failure to provide medical and psychological treatment as alleged in
Count IX.

5.   <u>Wrongful Death, Count XI</u>

Plaintiff alleges that the Individual Defendants wrongfully caused
Andrew's death.  <u>Second Amended Complaint</u>, ¶ 98.  Under Illinois law,
wrongful death occurs when a person's death is "caused by a wrongful act,
neglect or default, and the act, neglect or default is such as would, if death

had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof . . . ."  740 ILCS § 180/1.  Defendant officers argue that there is no issue of fact as to whether their actions were the proximate cause of Andrew's death.

Plaintiff has presented evidence from Dr. Taraska that shows that Andrew died from the force used and the position of the officers and Andrew.  Further, Dr. Taraska's deposition testimony relates this condition to the officers' actions in subduing him.  Therefore, Plaintiff has created a genuine issue of material fact as to whether the officers' intentional actions were the proximate cause of Andrew's death; therefore, Defendants' Motion for Summary Judgment on Count XI is denied.

## V.   STATE LAW CLAIMS AGAINST JOHN W. HARRIS, CHIEF OF POLICE

It is undisputed that Chief Harris was not present at any time during the incident in question, and took no direct action against Andrew. Therefore, his Motion for Summary Judgment as to Counts II-XI is allowed, and those claims are dismissed against him.

## VI.   STATE LAW CLAIMS AGAINST THE CITY OF SPRINGFIELD AS RESPONDEAT SUPERIOR

The City's only grounds for summary judgment for Plaintiff's state law claims against it under respondeat superior are derivative of the Individual Defendants' arguments that they are entitled to summary judgment on all Plaintiff's state law claims.  Plaintiff's state law claims against Sergeant Zimmerman, Officer Oakes, and Officer Oliver remain for Counts II, IV, VII, and XI.  Therefore, the City's Motion for Summary Judgment on those claims is denied, but is allowed with respect to Counts V, and IX, which are hereby dismissed against the City.  As previously noted, the Court dismisses Count III as duplicative of the claims in Count II.

## VII.  SPOILATION OF EVIDENCE

Plaintiff asserts a claim for negligent spoilation of evidence against all Defendants for failure to retain the hobble used to restrain Andrew.  Second

<u>Amended Complaint</u>, Count XIII.  Defendants argue that their Motion for Summary Judgment as to Plaintiff's claim should be allowed because they had no duty to Plaintiff to preserve the hobble.  They further argue that any failure by them to retain the hobble did not cause prejudice to Plaintiff.

To state a claim for negligent spoilation, a plaintiff must show "the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages."  <u>Jackson v. Michael Reese Hosp. and Medical Center</u>, 294 Ill.App.3d 1, 10, 689 N.E.2d 205, 211 (1st Dist. 1997), <u>citing</u> <u>Boyd v. Travelers Ins. Co.</u>, 166 Ill.2d 188, 194-95, 652 N.E.2d 267 (1995).  There is no common law duty to preserve evidence, although "a defendant owes a duty of care to preserve evidence 'if a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action.'"  <u>Id.</u> at 10-11, 212, <u>quoting</u> <u>Boyd</u>, 166 Ill.2d at 195.

At his deposition, taken June 25, 2004, Officer Oakes testified that he destroyed the hobble in question "about two years ago, cut [it] in half, thrown away in the dumpster behind the building here."  <u>Plaintiff's Response</u>, Exh. 3, <u>Oakes Dep.</u>, pg. 71.  He explained that he destroyed his hobble because "[a] notice came out . . . that we are no longer allowed to

use [hobbles], so it was rendered worthless.  There was no point to keep it anymore." Id.  Further, the record reflects that Chief Harris issued a notice prohibiting Department officers from using hobbles to subdue arrestees on September 10, 2002. Id., Exh. 9, Lyman Report, pg. 11 n.24.  Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court determines that Officer Oakes destroyed the hobble on or around September 10, 2002.

Plaintiff's initial Complaint was filed April 28, 2003, at least seven months after Oakes says he destroyed the hobble.  Complaint (d/e 1). Although Plaintiff alleges in her Complaint that her attorneys were present at the various Internal Affairs oral examinations of "various Defendants", Plaintiff presents no evidence to that affect.  See Second Amended Complaint, ¶ 115.  The record is devoid of evidence as to when such oral examinations occurred and who was present.  Therefore, Plaintiff has not created a genuine issue of material fact as to whether a reasonable person in the Defendants' position would have anticipated that the hobble would be material to a civil action because she has not shown that the Defendants knew a civil action was imminent.

Further, Plaintiff has also failed to show how her claim has been

prejudiced by Officer Oakes' destruction of the hobble.  Plaintiff contends that she "may be unable to prove her case, because she may be required to show the distance between Andrew Sallenger's ankles and hands at the time he was hogtied. . . . [in order to] affect Dr. Harshbarger's opinion as to Andrew Sallenger dying from positional asphyxiation." Plaintiff's Response, pg. 83.  When posed with a hypothetical regarding what it would take for him to reconsider his diagnosis that Andrew died of cardiac failure, not positional asphyxia, however, Dr. Harshbarger did not describe the distance between Andrew's feet and hands as being significant.

> A.  . . . if he can't move, and the bed is up against his abdomen, that's going to impede his ability to breathe.  There's weight applied to him, which impedes his ability to expand his chest.  And he's not struggling so that he can't get out of that, there's no release of that position, and we're talking a period of five minutes then I would, probably, reflect on [his position that Andrew died of cardiac failure, not positional asphyxia].

> Q.  And you might come to a diagnos[is] of positional asphyxia?

> A.  In an individual case I would come closer to that.

Defendants' Motion, Exh. 5, Harshbarger Dep., pg. 114-15.  Therefore, Defendants' Motion for Summary Judgment on Plaintiff's negligent spoilation of evidence claim is allowed.

VIII. <u>AMERICANS WITH DISABILITIES ACT CLAIM</u>

All Defendants move for summary judgment on Plaintiff's Count XII, brought pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 <u>et seq.</u>, which seeks $75,000.00 plus reasonable attorney's fees and costs from each Defendant.  Defendants Oakes, Oliver, Zimmerman, and Harris contend that the ADA does not provide for individual liability. Defendant City asserts that Andrew was neither wrongly arrested due to his disability, nor denied the benefit of services provided by the City.  For the reasons set forth below, Defendants' Motion is allowed.

A.    <u>ADA Claim Against the Individual Defendants</u>

Plaintiff alleges that the Individual Defendants are a "public entity," pursuant to 42 U.S.C. § 12131, and are therefore subject to suit under the ADA.  <u>Second Amended Complaint</u>, ¶ 105.  Section 12131 is under Title II of the ADA, which addresses discrimination with regard to public services by a public entity.  In <u>Walker v. Snyder</u>, the Seventh Circuit held that Title II does not support suits against individuals for monetary relief.  <u>Walker</u>, 213 F.3d 344, 346 (7th Cir. 2000).  In <u>Walker</u>, the court held that the entity is the proper defendant and that there was no personal liability for individual defendants under Title II.  <u>Walker</u>, 213 f.3d at 347.  In <u>Walker</u>,

the court further found that there was no basis for prospective injunctive

relief against the State in federal court--that Ex Parte Young only permitted

actions for prospective injunctive relief against state officers as individuals

and that those officers, as individuals, were not proper defendants under

Title II.  Id.

Later case law, however, clarified that a state official could be sued in

his official capacity in federal court for prospective injunctive relief.  See

Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356 (2001);

Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906 (7th Cir. 2003);

Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599 (7th Cir. 2004).

On that point, Walker has been overruled.  However, the balance of the

Walker decision, holding that there is no personal liability for individual

defendants for damages under Title II of the ADA, remains viable.

Plaintiff's contention that Walker has been overruled on this point is

erroneous.  Count XII of Plaintiff's Second Amended Complaint alleges a

claim for monetary damages, not injunctive relief, against the Individual

Defendants.  Those Individual Defendants are not an entity.  The proper

Defendant for this claim is the City (the public entity) not the Individual

Defendants.  Therefore, the Individual Defendants' Motion for Summary

Judgment is allowed on Count XII.

B.   <u>ADA Claim Against the City of Springfield</u>

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132 (Title II).   Defendant City does not dispute that Andrew was a "qualified individual with a disability," or that it is a "public entity." Instead, Defendant City asserts that it neither wrongly arrested Andrew due to his disability, nor denied him the benefit of its services.   <u>Defendants'</u> <u>Motion</u>, pgs. 50-51, <u>citing</u> <u>Gohier v. Enright</u>, 186 F.3d 1216, 1220-22 (10th Cir. 1999).   In response, Plaintiff argues that the City failed to accommodate Andrew's disability during the course of the arrest.   <u>Plaintiff's</u> <u>Response</u>, pg. 71.

In <u>Hainze v. Richards</u>, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."   <u>Hainze</u>, 207 F.3d 795, 801 (5th Cir.

2000), <u>rehearing</u> <u>en banc</u> <u>denied</u>, 216 F.3d 1081, <u>cert. denied</u>, 531 U.S. 959

(2000).  The Fifth Circuit's approach has been adopted by various other

courts.  <u>See</u> <u>Hogan v. City of Easton</u>, 2004 WL 1836992 (E.D. Pa. Aug. 17,

2004) (finding a claim under Title II because the situation was secure when

the officers arrived on the scene); <u>Vincent v. Town of Scarborough</u>, 2003

WL 22757940, *25-26 (D. Me. Nov. 20, 2003) (finding that exigent

circumstances prohibited the existence of a Title II claim); <u>McCray v. City</u>

<u>of Dothan</u>, 169 F.Supp.2d 1260, 1274-75 (M.D. Ala. 2001) (finding it <u>per</u>

<u>se</u> reasonable "to disregard a suspect's disability until overriding concerns

of public safety are ensured."), <u>aff'd in part</u>, <u>reversed in part on other</u>

<u>grounds</u>, 2003 WL 23518420 (11th Cir. Apr. 24, 2003).  The Seventh

Circuit does not appear to have addressed this issue.

Plaintiff urges the Court to follow the decision in <u>Schorr v. Borough</u>

<u>of Lemoyne</u>, 243 F.Supp.2d 232 (M.D.Pa. 2003).  In <u>Schorr</u>, however, the

court stressed that the alleged ADA violation did not occur at the moment

of the violent encounter between the officers and Ryan Schoor, the bipolar

individual whom the officers had been dispatched to take into custody

subject to an involuntary commitment petition.  Instead, the court noted:

The alleged non-compliance with the training requirements of

the ADA did not occur the day that the officers shot Ryan Schorr; it occurred well before that day, when the Defendant policy makers failed to institute polices to accommodate disabled individuals such as Schorr by giving the officers the tools and resources to handle the situation peacefully.

Schorr, 243 F.Supp.2d at 238.  The Schorr court distinguished Hainze by noting that it's "exigent circumstance" analysis would not apply because "Plaintiffs have not brought this action against any of the officers involved, nor are they challenging the degree of force used by the officers, and any exigent circumstances at the time of arrest are therefore irrelevant."  Id.

In the present case, however, Plaintiff has filed claims against the officers involved and challenged their use of force.  There were exigent circumstances present during the 10-15 minute struggle between Andrew and the officers.  The melee began as soon as Andrew saw the officers in the house.

After reviewing the cases cited above, the Court finds the Hainze court's analysis most compelling.  Hainze recognized that the safety of the officers and other civilians must be weighed in the context of Title II's mandate to accommodate a disability.  Hainze, 207 F.3d at 801.  Further, the Hainze court noted that its decision clearly did not foreclose all means of recovery.  Id.  The same is true here.  Plaintiff may proceed to trial on her

excessive use of force claims.  While the Individual Defendants may be found to have used too much force, there is no evidence that they used more force against Andrew because of his mental disability.  Any requirement to accommodate his disability during the course of his arrest would only come into play once the exigent circumstances surrounding the struggle ceased. In this case at that point, or very shortly thereafter, Andrew stopped breathing.  The officers then promptly summoned medical help.  Therefore, no genuine issues of material fact exist on this claim.  Defendant City's Motion for Summary Judgment on Count XII is allowed.

<u>CONCLUSION</u>

THEREFORE, for the reasons set forth above, Defendants' Motion For Summary Judgment (d/e 86) is ALLOWED in part, and DENIED in part.  All Plaintiff's claims against Defendant John W. Harris, Chief of Police, are hereby dismissed.  Defendants Sergeant James Zimmerman, Officer Brian Oakes, and Officer Jason Oliver's Motion for Summary Judgment on Count I is allowed in part, and denied in part.  It is allowed with respect to Plaintiff's claim of failure to provide medical care and involuntary commitment claims, but it is denied with respect to Plaintiff's excessive use of force claim.  It is also allowed with respect to Plaintiff's

First, Sixth and Eighth Amendment claims in Count I.  Defendants Sergeant James Zimmerman, Officer Brian Oakes, and Officer Jason Oliver's Motion for Summary Judgment on Plaintiff's state law and ADA claims is allowed in part, and denied in part.  It is allowed with respect to Counts III, V, IX, XII, and XIII, but it is denied with respect to Counts II, IV, VII, and XI.  Defendant City of Springfield's Motion for Summary Judgment is allowed in part, and denied in part.  It is allowed with respect to Counts I, III, V, IX, XII, and XIII, but denied with respect to Counts II, IV, VII, and XI.

IT IS THEREFORE SO ORDERED.

ENTER:   August 4, 2005.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE

81